## Creed v. Atlantic Independent Union

*Louis Wilderman* of *Wilderman & Kirschner*, for plaintiffs.

*Charles J. Short, Martin Wald* of *Schnader, Harrison, Segal & Lewis* and *Henry G. Schaefer, Jr.*, for defendants.

SPORKIN, J., March 14, 1973.—Plaintiffs, Dennis A. Creed, Joseph E. Boland, Joseph J. Ryan, and Robert M. Shaffer brought this action in equity against defendant Atlantic Independent Union (AIU), seeking to enjoin and to nullify the national election of officers of AIU. In the same suit, also named as defendants are Joseph E. Thompson, Jr., Charles Webb,

John Nussbaumer, John O'Brien, Joseph A. Mullan, as individuals, and Walter Camenisch, Inc.[1]

As the basis for the relief sought, plaintiffs allege in their complaint, inter alia: that fraudulent and scurrilous literature, damaging to plaintiffs in their candidacies was distributed under the individual defendants' auspices; that notice of the election was not sent to members at least 15 days prior to the election; and that, in violation of the AIU constitution and bylaws, the ballots, bearing a deadline of 11:59 p.m. on November 17, 1972, were not mailed to members at least 15 days before the deadline.[2] To this com-

[1] The four plaintiffs, Creed, Boland, Ryan and Shaffer are candidates in the election for the offices of President, Vice President, Secretary and Treasurer of AIU. Three of the defendants, Thompson, Nussbaumer and O'Brien are the incumbent AIU President, Secretary and Treasurer, and are campaigning for reelection, opposing plaintiffs Creed, Ryan and Shaffer in their candidacies. One of the defendants, Webb, is the current AIU Vice-President, but is not running for reelection, and another defendant, Mullan, not an incumbent, is campaigning on defendant's slate for the office of Vice President. Defendant, Camenisch, Inc., has been engaged by AIU to receive and count ballots, which have been distributed to members of the collective bargaining unit by AIU. (By agreement between the parties, before Hirsh, J., on November 17, 1972, the ballots were not to be counted by Camenisch, pending disposition of the instant action.)

[2] The AIU constitution and bylaws provide that *notices* of an election shall be mailed to each member at least 15 days prior to an election. No reference is made to a time limit, however, for the mailing of *ballots* prior to an election.

It is to be observed that nowhere in their complaint or in the evidence presented have plaintiffs offered proof of any violation of the *notice* provision, but instead aver simply that *ballots* were not mailed at least 15 days prior to the election. It is apparent, therefore, that plaintiffs seek to have this court construe the clause providing a time limit for sending election notices as applying to the time limit for the mailing of ballots. In light of our disposition of this case, however, which will be discussed hereinafter, no finding is required on the proper construction to be given to the AIU Constitution and bylaws clause alleged to have been violated.

plaint defendants have filed preliminary objections in the nature of a motion to dismiss, asserting that: (1) This court is without jurisdiction; (2) plaintiffs have an adequate remedy at law; (3) plaintiffs failed to effectively pursue internal union remedies before seeking judicial relief; (4) plaintiffs are guilty of inexcusable laches; and (5) plaintiffs have suffered no irreparable injury.[3]

These preliminary objections are now before us. In directing our inquiry to the determination of defendants' preliminary objections, we believed it essential to hear testimony. However, some factual evidence was presented which, in our opinion, was inextricably bound up with the preliminary objections, yet was pertinent to and concerned the merits of the issues raised by plaintiffs. The threshold question, however, is whether this court has jurisdiction, and no factual testimony pertaining to the parties' campaign conduct will be considered absent our concluding that we have jurisdiction herein. Upon consideration of oral arguments, of the briefs of counsel, and of such relevant testimony as we are permitted to consider on the preliminary objections, we are convinced that this court lacks jurisdiction.

Since the complaint challenges the election process of a union, we believe that we must give critical consideration to Title IV of the Labor-Management Reporting and Disclosure Act of September 14, 1959, 73 Stat. 534, sometimes referred to as the Landrum-Griffin Act: 29 U. S. C. §§481-83.[4] It is evident

---

[3] Mullan was neither represented by counsel, nor did he join in the defenses presented.

[4] Section 482 of this act provides, in pertinent part:

"(a) A member of a labor organization . . .

"(2) who has invoked such available [internal] remedies without obtaining a final decision within three calendar months after their invocation may file a complaint with the Secretary [of Labor] within one calendar month thereafter alleging the viola-

that by enacting this legislation, Congress intended to occupy the field pertaining to the conducting of union elections, thus preempting the authority of State legislatures and judiciaries in that area of the law. In the same vein, our Pennsylvania Supreme Court stated in very explicit language that:

"Where the Congress of the United States enacts a comprehensive statute which is intended to occupy the field, the Supremacy Clause of the United States Constitution requires that the state legislature and judiciary defer to the superior command of Congress. This doctrine is particularly applicable in the area of labor law. . . . Aside from the express language of the [Landrum-Griffin Act], the great detail and comprehensiveness of Title IV indicates that Congress intended to occupy the field." (Parenthetical insertion supplied.) Mamula v. United Steelworkers of America, 409 Pa. 175, 178-79, 185 A.2d 595 (1962).

It is clear, therefore, that in accord with Mamula, this command of Congress must not and cannot be ignored by us. Plaintiffs, looking retrospectively at the course of campaign conduct of defendants in the

tion of any provision of section 481 of this title (including violation of the constitution and bylaws of the labor organization pertaining to the election and removal of officers). The challenged election shall be presumed valid pending a final decision thereon (as hereinafter provided) and in the interim the affairs of the organization shall be conducted by the officers elected or in such other manner as its constitution and bylaws may provide." (Bracketed portions supplied.)

Section 483 states, in relevant part:

"Existing rights and remedies to enforce the constitution and bylaws of a labor organization with respect to elections prior to the conduct thereof shall not be affected by the provisions of this subchapter. The remedy provided by this subchapter for challenging an election already conducted shall be exclusive."

subject election, endeavor to enjoin and to nullify the election by the commencement of these proceedings only eight and one-half hours before the deadline for receipt of ballots.[5] Assuming, as plaintiffs have argued, that the alleged conduct of defendants so tainted the election as to render it invalid, we must ask whether we would be properly effectuating the command of Congress embodied in the Landrum-Griffin Act by our accepting jurisdiction herein. The United States Supreme Court has summarized both the mechanics of enforcement of the Landrum-Griffin Act and the reasons therefor, in Calhoon v. Harvey, 379 U.S. 134 (1964). Mr. Justice Black, speaking for the majority in Calhoon, stated that:

"Section 402 [now 29 U.S.C. section 482] sets up an exclusive method for protecting Title IV rights. . . . It is apparent that Congress decided to utilize the *special knowledge and discretion of the Secretary of Labor* in order to best serve the public interest. . . . In so doing Congress, with one exception not here relevant, decided not to permit individuals to block or delay union elections by filing federal-court suits for violations of Title IV. Reliance on the discretion of the Secretary is in harmony with the *general congressional policy to allow unions great latitude in resolving their own internal controversies, and, where that fails, to utilize the agencies of Government most familiar with union problems to aid in bringing about a settlement through discussion before resorting to the Courts.*" (Italics supplied.) Id. at 140.

The congressional intendment to deter individuals from blocking or delaying the union election process

---

[5] This equity action was initiated at about 1 p.m. on November 17, 1972, and the complaint was filed two and one-half hours thereafter.

by going at the eleventh hour to the courts and seeking to enjoin an election was recently reiterated by our own Third Circuit Court of Appeals, in McDonough v. Operating Engineeers, Local No. 825, — F.2d — (3rd Cir., December 6, 1972), 69 Labor Cases 25,793, which, in holding that the Secretary of Labor alone had jurisdiction in a case where balloting had occurred, stated the following:

"To say, as the district court did, that the election is not completed until the result is certified would set up a race to the court house. . . . It would cause the judicial interference which Congress attempted to avoid": Id. at 25,795.

In the case at bar, the deadline for balloting was less than nine hours after the complaint was filed, and all ballots may even have been marked at that point in time. Further, with the balloting now completed, plaintiffs have asked this court to make the same retrospective type of inquiry, in a post-election context, as would be made by the Secretary of Labor had plaintiffs sought to process their grievance in the administrative channels provided by section 482 of the act. To accept jurisdiction under these circumstances would give the impression that this court countenances the identical race to the courthouse as discouraged by the court in McDonough, with the concomitant judicial intermeddling that Title IV seeks to avoid. We would, moreover, be acting in contravention of the policy of the Landrum-Griffin Act set forth in Calhoon, by snatching the question away from consideration within the superior investigative powers and expertise of the Secretary of Labor.

It is also clear to us that under the Landrum-Griffin Act, State courts are not the sole source of protection for a candidate against an opponent's abuse of the electoral process during a campaign. During

an election, candidates' misconduct can be regulated through internal control by the union itself. Invoking such internal processes is, in fact, the avenue expressly preserved by section 483 of the Landrum-Griffin Act, for complaints against wrongdoing during the course of an election.[6]

Plaintiffs in the instant case did not initially pursue any of the avenues provided by AIU's constitution and bylaws to have the union settle election disputes. Plaintiffs assert that exhaustion is unnecessary here, because the remedies provided are merely illusory, on the theory that the AIU committees which would rule on plaintiffs' allegations are populated by defendants or by members of defendants' slate. Defendants, however, have stated that they would be willing to have only those not affiliated with either group now vying for office, to sit among the designated members of each such committee. From the testimony adduced before us, we find considerable question as to whether there is a sufficient number of neutral members on each of the AIU committees to which plaintiffs could validly resort under the union constitution and bylaws so as to assure a fair disposition of their grievances therein. Since we hold that we are without jurisdiction over this subject matter, however, it is unnecessary to determine whether plaintiffs have effectively pursued their remedies within the union, or whether the internal AIU remedies here would be illusory.

Nor can we subscribe to the position advocated by plaintiffs that if this court determined that we lacked jurisdiction to adjudicate the matter before us, we ought nevertheless to enjoin the counting of ballots and order that such ballots be sent forthwith to the

---

[6] Quoted at footnote 4 of this opinion.

Secretary of Labor; and if the secretary then held that he had jurisdiction of the election fraud claim of plaintiffs, he would make such further disposition as he felt required by his obligations under law; but if he decided instead that the matter was not yet ripe for the exercise of jurisdiction by his office, plaintiffs urge that this court should resume jurisdiction to decide the merits of the complaint.[7]

There are reasons which make such a course impossible, for to adopt such a procedure would have us bow to a decision of the secretary on a question of statutory interpretation regarding *jurisdiction*. For this court to defer in such manner to a governmental agency would be a total abdication of our judicial function and responsibility to decide the *legal* question of jurisdiction. As previously stated, we lack jurisdiction in this matter, and, lacking jurisdiction, we most assuredly cannot issue *any* injunctive relief, let alone the type of partial relief suggested by plaintiffs.

As stated by our Pennsylvania Supreme Court:

"If the legislature provides a specific, exclusive, constitutionally adequate method for the disposition of a particular kind of dispute, no action may be brought in any 'side' of the Common Pleas to adjudicate the dispute by any kind of 'common law' form of action other than the exclusive statutory method": West Homestead Borough School District v. Allegheny County Board of School Directors, 440 Pa. 113, 118, 269 A.2d 904 (1970).

---

[7] Plaintiffs argue further that the secretary may very likely decline to exercise any jurisdiction until after the ballots have been counted. This fear is unfounded, however, in light of the McDonough holding that an election has been "already conducted," and the secretary, therefore, assumes jurisdiction, at the very point in time at which the instant proceedings now exist, namely, where balloting has occurred but the votes are still uncounted.

There, Mr. Justice Jones, now Chief Justice, in very impressive language stated further that injunctive or other equitable relief should not be granted unless provided for by such statutory scheme or unless some irreparable harm would result if the statutory procedures were not followed: Id., at 118.

In holding that we are without jurisdiction in this cause, we have indicated heretofore that the proper remedy for plaintiffs is under Title IV of the Landrum-Griffin Act, 29 U.S.C. §482 (a)(2), the remedy of which is exclusive: 29 U.S.C. §483. Under section 482, supra, "the challenged election shall be presumed valid pending a final decision thereon." Thus, an order by this court, in the absence of exercising jurisdiction over the subject matter of the complaint, would be a perversion of the intended exclusive statutory scheme, and is beyond our scope of authority as defined in West Homestead, supra. Under the law as we view it, if the counting of ballots is to be enjoined, the only office authorized to make such an order is that of the Secretary of Labor.[8]

---

[8] Plaintiffs cite, as controlling our decision herein, the Per Curiam decision of the Court of Appeals in Jennings v. Carey —F. 2d—, 58 LRRM 2606 (D.C. Cir., 1965), ordering that the ballots be delivered to the Secretary of Labor, to be acted upon "as he is advised pursuant to his obligations under the law," and that the ballots should remain in the secretary's custody "until further order of this court." It is to be noted, though, that Jennings involved a claim of impropriety in the counting of ballots, and not in the election campaign itself; thus, we believe it was perfectly proper and, indeed, necessary for the secretary to take control of this function therein. Secondly, the secretary was a party appearing of record in Jennings, as opposed to the case at bar, and *agreed* therein to the entry of such an order. Such is not the situation confronting us. We are in no way bound by Jennings, then, to enjoin the counting of ballots herein and to certify this case to the Secretary of Labor, and since we hold that we lack jurisdiction, we are powerless to duplicate the Jennings order herein.

Plaintiffs also cite Schonfeld v. Penza, —F. Supp. —, 82 LRRM

Further, plaintiffs have contended that the sole issue arising from defendants' preliminary objections now before us, is whether or not this election has been "already conducted" within the meaning of 29 U.S.C. §483, supra. Plaintiffs argue that unless an election is "already conducted," a State court *must* reach the merits of a complaint which seeks to enjoin an election. This argument, however, overlooks the very language of section 483. That section, cited supra at note 4, states that "existing rights and remedies to enforce the constitution and bylaws of a labor organization with respect to elections *prior to the conduct thereof*," shall not be affected by the provisions of Title IV. Thus, in our view, *prior* to the beginning of an election campaign a plaintiff would be on firm ground to argue that a state court has jurisdiction. After an election is *"already conducted,"* however, the remedy established by Title IV is exclusive: 29 U.S.C. §483.

The wording of section 483, we are bound to conclude, does not confer *mandatory* jurisdiction upon a State court where a complaint is filed between the time "prior to the conduct" of an election and the point at which an election is "already conducted." At best, the act leaves open the possibility that a State court might, in a proper case, assert jurisdiction to reach the merits of such a case. As expressed above, however, the policy against usurpation by

2126 (S.D.N.Y., 1973). In that case, however, a preliminary injunction was issued pursuant to pendant jurisdiction of the court, assumed in a *Title* I claim, which title vests jurisdiction for such claims in the District Court, from which any Title IV claims would merely be an outgrowth. In the instant equity proceedings, however, as previously emphasized, we do not have jurisdiction over *any* part of the controversy; the Schonfeld decision is, therefore, plainly distinguishable.

State courts of the Secretary of Labor's function and responsibility is strong.

To allow a candidate to possibly disrupt an election campaign at any time, by seeking State court injunctive relief upon possibly even the barest allegations, would, in our estimation, be the very antithesis of that deference which we must give to a statutory scheme such as the Landrum-Griffin Act by which Congress has preempted the field. We believe that when an election is halted in order to allow a judicial investigation into alleged misconduct by a candidate, the electorate's suspicions might very likely be aroused against the subject of the investigation. If, as argued by plaintiffs, State courts had a mandatory duty to accept equity jurisdiction to adjudicate the merits of every complaint of wrongdoing during the course of a campaign, any candidate whose campaign appeared to be going poorly would thus be encouraged to stir the suspicions of the electorate by filing such a complaint, with the possible result that the election would then be skewed or at least severely disrupted regardless of whether an injunction did or did not later issue.

Under the preemption doctrine, State courts must defer whenever possible to the superior command of Congress which with respect to Title IV of the Landrum-Griffin Act is, as heretofore outlined in Calhoon, supra, to allow unions great latitude in resolving their own internal controversies and, where that fails, to utilize the special knowledge and discretion of the Secretary of Labor. It is our opinion that our court should not lend itself to encouraging disgruntled candidates to possibly attempt to circumvent the congressional purpose of Title IV, merely by filing in a State court minutes, or hours, before the deadline for balloting, especially where, as here, the

alleged wrongdoing took place as much as two weeks earlier, and, as such, consisted of isolated acts rather than of a continuing course of conduct still ongoing at the time of the injunction prayer.

Finally, in order for a court in equity to issue injunctive relief, plaintiff must show that he will suffer some irreparable harm unless the conduct complained of is enjoined: Windber Borough v. Spadafora, 356 Pa. 130, 134, 51 A.2d 726 (1947). As mandated by West Homestead, supra, if a complete and adequate statutory method for disposing of the complaint exists, such as embodied in 29 U.S.C. §482(a)-(2), supra, injunctive relief is not available in a State court absent a showing that some irreparable harm will result if plaintiff is left to his remedies under the statutory scheme.

We see no irreparable harm in having plaintiffs follow the intended and exclusive statutory scheme provided in 29 U.S.C. §482(a)(2), and, therefore, no exception to the West Homestead rule under these facts, even if that scheme comes to allow these ballots to be counted. Certainly, a tally of the votes in this election may very well show plaintiffs to be the victors. Moreover, should defendants be the winners, we cannot say that any benefits of whatever momentary legitimacy defendants may gain in their offices thereby, will not be more than erased by a later finding by the secretary that plaintiffs' claim is meritorious and that a new election would be ordered, if, in fact, the secretary so finds.

It is conceivable that if the conduct complained of were continuing, or ongoing in nature, plaintiff might be able to demonstrate that irreparable harm would follow were he forced to wait until the votes were counted before seeking relief from the wrongdoing, and thus that an area may exist wherein a State court

would properly assert jurisdiction to consider campaign conduct in a union election. In the case at bar, however, the acts complained of were acts allegedly perpetrated at least 12 days before any complaint was filed. The gravamen of the complaint is that such isolated past actions constituted misconduct suffficient to justify invalidating the election. As we have noted before, though, the complaint was filed on the last day for receipt of ballots and what damage, if any there was, had been done. We strongly believe that no irreparable harm would result here by having plaintiffs pursue their statutory remedy under the Landrum-Griffin Act, by processing their complaint with the secretary; in fact, with the superior expertise and investigative powers available to his office, the secretary could possibly conduct a more thorough study of this election in order to discover misconduct if such, indeed, existed.[9]

In Rarick v. United Steelworkers of America, 190 F. Supp. 158 (W. D. Pa. 1960), a case analogous to the instant equity action, plaintiffs' preelection prayer for injunction was dismissed for failure to show either irreparable harm or lack of an adequate statutory remedy. There, Judge Marsh stated:

"Plaintiff alleges a number of instances of unlawful conduct which he contends prejudiced his rights, and the rights of certain members of local unions, with respect to his avowed candidacy for president. *However, we do not believe that plaintiff will suffer immediate and irreparable harm for these reasons, since there are procedures available to the plaintiff*

---

[9] We furthermore believe that in a mail ballot election such as that in the instant case, where the deadline for post-marking ballots is only eight and one half hours after the filing of a complaint, the election *is*, at such point, "already conducted."

*within the union to redress his grievances, and even if plaintiff is unsuccessful within the union prior to election [29 U.S.C.A. 482], supra, provides a remedy after the election has been held whereby an invalid election, if such there was, may be set aside and a new election held":* Id., at 159.[10] (Italics supplied.)

We are in accord with the pronouncements of Rarick. That plaintiffs have not shown irreparable harm or lack of an adequate statutory remedy herein is, therefore, ominously clear, since they may, as previously emphasized, proceed to have their complaints considered by the secretary as provided in the Landrum-Griffin Act, where they could validly have their interests taken care of. In holding that equity's intervention is not needed in this case we make no finding whatsoever as to the truth or falsity of plaintiffs' allegations regarding defendants' course of campaign conduct, but instead leave that finding to proper authority.

Defendants' preliminary objections, asserting that this court is without jurisdiction, that plaintiffs have failed to show that they will suffer irreparable harm if injunctive relief is not granted, and that plaintiffs have an adequate statutory remedy, are hereby sustained. We make no finding on the other grounds alleged by defendants in their preliminary objections, since such is not required in light of the

---

[10] It is interesting to note that in Boling v. International Brotherhood of Teamsters, etc., 224 F. Supp. 18 (E.D. Tenn., 1963), the United States District Court also dismissed a pre-election action to enjoin a union election, stating:

"It is apparent that . . . plaintiff has available a post-election remedy under Title IV, Section 402 [29 U.S.C.A. Section 482] . as summarized above. He can claim no irreparable injury. It is clear, therefore, that no temporary injunction should issue in this case": Boling, supra, at page 20 [See also Johnson v. San Diego Bartenders Union, Local 500, 190 F. Supp. 444 (1961)] .

conclusions we have reached in this cause. The rule to show cause why an injunction should not issue shall be discharged, and the complaint dismissed, without prejudice to rights of the parties to pursue their statutory remedies under 29 U.S.C. §481, et seq.

On March 9, 1973, we published our order in this cause in which we denied plaintiffs' prayer for injunctive relief, due to lack of equitable jurisdiction over the subject matter, inadvertently captioning the order "Decree Nisi" when, in fact, it should have been properly headed "Order."

It is obvious that where, as here, the court dismisses an action for lack of jurisdiction over the subject matter, the decision dismissing the action should take the form of an order and is appealable as in the case of a final judgment: Act of March 5, 1925, P. L. 23, sec. 1, 12 PS §672. See also West Homestead, supra, at 117-19.[11]

In light of the above, our order headed "Decree Nisi" is hereby amended to read "Order," and is intended to be a final order. In view of our detailed discussion in this opinion, we now enter the following

---

[11] Moreover, it is to be noted that our disposition herein is made solely upon the allegations of the complaint, and the preliminary objections thereto. (See our discussion at the top of page supra, wherein we stated that while some factual testimony was received, our disposition of the preliminary objections was made upon a consideration of the pleadings only, and not upon testimony that concerned the merits of plaintiffs' complaints.) We are conversant with the proposition that where disposition is made solely upon the pleadings, as in the instant equity proceedings, our Pennsylvania Supreme Court has held that a decree nisi is not a prerequisite to a final decree, and a decree dismissing the case under such circumstances may be taken as being a final decree: Panther Valley T.V. Co., Inc. v. Summit Hill Borough, 372 Pa. 524, 94 A. 2d 735 (1953); 8 Standard Pa. Pract. §294 (1961 Ed.).

224

## ORDER

And now, to wit, March 14, 1973, it is hereby ordered and decreed as follows:

1. This court lacks equitable jurisdiction of the subject matter herein;

2. The preliminary objections of defendants, Atlantic Independent Union, Joseph E. Thompson, Jr., Charles Webb, John Nussbaumer, John O'Brien, and Walter Camenisch, Inc., are sustained;

3. Accordingly, the rule to show cause why an injunction should not issue is hereby discharged, and the complaint dismissed, without prejudice to rights of the parties to properly pursue their statutory remedies under the Landrum-Griffin Act, 29 U.S.C. §481, et seq.